UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PAUL KORDA, Derivatively on Behalf of ANGIE'S LIST, Inc., | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Cause No. 1:14-cv-00004 |
| WILLIAM S. OESTERLE, ANGELA R. HICKS BOWMAN, CHARLES HUNDT, ROBERT R. MILLARD, MANU THAPAR, MICHAEL D. RUTZ, JOHN W. BIDDINGER, MARK BRITTO, JOHN H. CHUANG, STEVEN M. KAPNER, KEITH J. KRACH, ROGER H. LEE, MICHAEL S. MAURER, and SUSAN THRONSON, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| -and- | ) ) | |
| ANGIE'S LIST, INC., | ) ) | |
| Nominal Defendant. | ) | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Paul Korda, by his undersigned attorneys, submits this Verified Shareholder Derivative Complaint in the name of and on behalf of nominal defendant Angie's List, Inc. ("Angie's List" or the "Company") against certain directors and officers of Angie's List named herein. Plaintiff bases his allegations on personal knowledge as to his own acts, and on information and belief as to all other allegations, based on investigation by counsel, including:

(a) review and analysis of public filings made by Angie's List and other persons with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications caused to be disseminated by certain of the Defendants and other persons; (c) review of news articles, shareholder communications, and postings on Angie's List's websites concerning the Company's public statements; and (d) review of other publicly available information concerning Angie's List and other persons.

## INTRODUCTION

1.      Angie's List is a pioneer in the field of providing Internet users with customer reviews of and referrals to businesses in local markets across the United States.  Founded as Brownstone Publishing, LLC in 1995 by Angela R. Hicks Bowman (the "Angie" in "Angie's List"), the Company has grown to annual revenues of over $150 million.  Operating under the slogan that "You can't pay to be on Angie's List," the Company's uniqueness lay in the fact that its business was based on memberships (typically for an annual period) bought and paid for by users.  Thus, unlike the vast majority of web-based "customer review" platforms, Angie's List neither accepted advertising from service providers (whether such providers were reviewed or not) nor did it allow non-paid Internet users to post reviews.  This "by members/for members" policy contributed to a perception of trustworthiness and a dramatic growth in the website's popularity and number of new subscribers.

2.      Angie's List became a publicly traded company in 2011, and for its first two years, the Company's shares traded between approximately $10 and $18 per share.  In 2013, however, the stock price experienced a meteoric rise, reaching a peak of $28 per share on July 1, 2013 and trading between $21 and $28 per share for the following three months.

3.     The Company's stock price was in fact artificially inflated during the relevant period, based on misstatements and omissions of material fact by Defendants, in violation of Defendants' fiduciary duties to shareholders such as Plaintiff.   These false statements and omissions included deceptions concerning every aspect of Angie's List's business, financial results, and future prospects—including the actual nature and viability of its business model, the sources of the Company's revenues, the increasing meaningless of the Company's claim that "You Can't Pay to be on Angie's List," the Company's shift to free or reduced-price memberships, the Company's acceptance of advertising from service providers and its allowing them to effectively dictate the placement and the content of member reviews, the unsustainability of the Company's sales of "hot leads" to service providers, the Company's failure to vet service providers, and the Company's practice of deleting or "white-washing" negative reviews by customers in deference to service providers.

4.     Once the truth behind Defendants' misstatements and omissions began to emerge, the Company and its shareholders were profoundly injured.   On September 30, 2013, the Company's chief technology officer, Defendant Manu Thapar, was terminated without explanation and without a replacement being named.   On October 2, 2013, the *Wall Street Journal* reported that the Company had drastically reduced prices for customer memberships and, in fact, was in the process of abandoning its traditional membership-fee-based business model.   Instead, the Company would now rely primarily on both revenues from advertising by service providers and on fees for serving as a payment conduit between customers and service providers.   In other words, Angie's List was already well into a migration to being just another generic, web-based "customer review" platform.   Then, on October 13, 2013, Angie's List announced third quarter 2013 financial results that were worse than the consensus expectations

of securities analysts, including a loss of $13.5 million, or $0.23 per share (versus expected $0.20 per share), and projected fourth-quarter revenues of only $68-69 million (versus expected $70.4 million). Moreover, the Company disclosed that its membership base had grown only 10 percent in the third quarter, to 2.38 million members (versus a 16 percent increase during the previous year's third quarter); and that some 64 percent of its revenues were now dependent on advertising by service providers.

5.      Finally, on October 24, 2013, the other shoe dropped. On that date, the financial press released articles reporting that Angie's List business was in long-term decline and that, short of a massive restructuring, the Company would be unable to avoid bankruptcy within one year. Moreover, rather than providing a trusted community of committed users, the Company had relied simply on aggressive sales and marketing practices, leaving most customers dissatisfied. Further, the Company's vaunted policy of carefully screening service providers on behalf of end users "was simply a matter of taking a check in exchange for favorable site position—with little or no investigation into the quality of the referred party." As a result of these and other disclosures, the Company's stock price dropped precipitously, closing at $14.64 per share on October 24, 2013—down $7.85 per share, or 35 percent, from its level of $22.49 on September 30, 2013. On December 31, 2013, ANGI closed at $14.23 per share—down almost 50% from its high of $28 per share on July 1, 2013.

6.      Aside from wiping out the wealth of hundreds of thousands of shareholders such as Plaintiff, Defendants have exposed the Company to very expensive legal costs to defend, investigate, and pay judgments or settlements in multiple shareholder class action lawsuits, including one action filed in this Court, *Baron v. Angie's List, Inc. et al.*, No. 1:13-cv-02032-

WTL-TAB (filed Dec. 13, 2013).  One analyst has estimated that potential damages against Angie's List in the *Baron* action could exceed $1 billion.[1]

7.      As shown in its current share price, at the hands of Defendants Angie's List's reputation for honesty and integrity has been ruined.  The Company will face increased costs of borrowing or raising equity capital in the future and will trade at a "liar's discount" in the public stock market for the foreseeable future.

8.      Finally, Defendants Oesterle, Hicks Bowman, Hundt, Thapar, Rutz, Krach and Maurer took advantage of the concealment of the true facts about the Company, and among themselves sold approximately $17 million of Company stock based on material non-public information during the last year alone.   In so doing, they misappropriated confidential information of Angie's List and must account for all profits on the ill-gotten proceeds of these sales.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 (diversity of citizenship) in that Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

10.     The Court has personal jurisdiction over each of the Defendants and Nominal Defendant Angie's List because each is either a corporation that conducts business in and maintains operations in this District or an individual with sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  Moreover, each Defendant has had extensive contacts

---

[1]      Michael Sacerdote, "Angie's List:  7.7% 2-Year Bankruptcy Risk Due to Litigation," *Seeking Alpha* (Dec. 29, 2013) (last visited Jan. 1, 2014).

with Indiana as a director and/or officer of Angie's List or otherwise, which makes the exercise of personal jurisdiction over them proper.

11.   Venue is proper in this Court because Angie's List has a substantial presence in Indiana, and is headquartered in this District.

## PARTIES

**Plaintiff**

12.   Plaintiff Paul Korda, a citizen of Colorado, is a current shareholder of Angie's List and has been a shareholder at relevant times to the claims asserted herein.

**Nominal Defendant**

13.   Nominal Defendant Angie's List is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1030 E. Washington Street, Indianapolis, Indiana.  The stock of Angie's List trades on the Nasdaq National Market under the symbol ANGI.

**Defendants**

14.   Defendant William S. Oesterle ("Oesterle"), 47, is the Chief Executive Officer and a member of the Board of Directors of Angie's List.  Oesterle received salary, bonus, stock and option awards, incentive compensation, and other compensation totaling $736,149 from Angie's List in 2012.  Oesterle owns 70% of Henry Amalgamated, an Indiana limited liability company which leased (and later sold) office facilities to Angie's List.  The Company made lease payments of approximately $1,000,000 to Henry Amalgamated in 2012, of which Oesterle's interest was $735,590.  In November 2012, Angie's List purchased the facilities from Henry Amalgamated for $6,250,000 and paid it an additional $178,000 to "prepare the properties for use," in both of which payments Oesterle had a substantial interest.  Oesterle owns 3,171,869

shares of common stock of Angie's List, constituting 5.5% of the total.  Oesterle is a citizen of Indiana.

16. 15. Defendant Angela R. Hicks Bowman (Hicks Bowman") , 40, is the Chief Marketing Officer and a member of the Board of Directors of Angie's List.  Hicks Bowman received salary, bonus, stock and option awards, incentive compensation, and other compensation totaling $563,248 from Angie's List in 2012.  Hicks Bowman owns 807,216 shares of common stock of Angie's List, constituting 1.4% of the total.  Hicks Bowman is a citizen of Indiana.

16. Defendant Charles Hundt ("Hundt"), 39, is the Controller of Angie's List and served as its interim Chief Financial Officer from April 1, 2013 to August 21, 2013.  He is a citizen of Indiana.

17. Defendant Robert R. Millard ("Millard"), 55, served as the Chief Financial Officer of Angie's List from 2011 to April 1, 2013 upon his termination.  Millard received salary, bonus, stock and option awards, incentive compensation, and other compensation totaling $461,116 from Angie's List in 2012.   He is a citizen of Indiana.

18. Defendant Manu Thapar ("Thapar"), 49, was the Chief Technology Officer of Angie's List from 2011 to September 30, 2013, when he was abruptly terminated without explanation.  Thapar received salary, bonus, stock and option awards, incentive compensation, and other compensation totaling $643,621 from Angie's List in 2012.   He is a citizen of California.

19. Michael D. Rutz ("Rutz"), 38, is the Vice President of Sales at Angie's  List. Rutz received salary, bonus, stock and option awards, incentive compensation, and other compensation totaling $365,619 from Angie's List in 2012. He is a citizen of Indiana.

20.     Defendant John W. Biddinger ("Biddinger"), 72, has been a member of the Angie's List Board of Directors since April 2006.   Biddinger is the Chair of the Audit Committee of the Board.   Biddinger received fees, stock awards, and options awards totaling $99,524 from Angie's List in 2012.  Biddinger owns 161,633 shares of common stock of Angie's List.  He is a citizen of Minnesota.

21.     Defendant Mark Britto ("Britto"), 48, has been a member of the Company's Board of Directors since September 2011.  Britto is the Chair of the Compensation Committee of the Board and a member of the Nominating and Governance Committee of the Board.  Britto received fees, stock awards, and options awards totaling $98,904 from Angie's List in 2012. Britto owns 128,588 shares of common stock of Angie's List.  He is a citizen of California.

22.     Defendant John H. Chuang ("Chuang"), 47, has been a member of Company's Board of Directors since April 1996.  Chuang is a member of the Nominating and Governance Committee of the Board.  Chuang received fees, stock awards, and options awards totaling $90,238 from Angie's List in 2012.   Chuang owns 11,626,698 shares of common stock of Angie's List, constituting 20.1% of the total.  In addition, Chuang is the CEO of TRI Ventures, Inc., the parent company of TRI Investments, LLC, which owns a further 11,618,769 shares (or 20.1%) of Angie's List.  Chuang is a citizen of Massachusetts.

23.     Defendant Steven M. Kapner ("Kapner"), 47, has been a member of the Company's Board of Directors since April 2008.   Kapner is a member of the Board's Compensation Committee.  Kapner received fees, stock awards, and options awards totaling $95,583 from Angie's List in 2012.   Kapner owns 11,626,698 shares of common stock of Angie's List, constituting 20.1% of the total.   In addition, Kapner is the Managing Director of

8

TRI Ventures, Inc., the parent company of TRI Investments, LLC, which owns a further 11,618,769 shares (or 20.1%) of Angie's List. He is a citizen of Massachusetts.

24.     Defendant Keith J. Krach ("Krach"), 55, is the Chairman of the Board of Directors and has been a member of the Board since April 2011. Krach also serves as the Chair of the Nominating and Governance Committee of the Board. Krach is the CEO, President, and Chairman of Docu-Sign Inc. ("Docu-Sign"), which provides electronic signature and online digital signature services to Angie's List and other customers. Docu-Sign received $57,499 from Angie's List in 2012. Krach owns 254,100 shares of the common stock of Angie's List. Krach is a citizen of California.

25.     Defendant Roger H. Lee ("Lee"), 41, has been a member of the Company's Board of Directors since April 2008. Lee is a member of the Board's Compensation Committee. Lee received fees, stock awards, and options awards totaling $91,476 from Angie's List in 2012. He is a citizen of California.

26.     Defendant Michael S. Maurer ("Maurer"), 70, has been a member of the Company's Board of Directors since February 2012. Maurer is a member of the Board's Audit Committee. Maurer received fees, stock awards, and options awards totaling $93,558 from Angie's List in 2012. He is a citizen of Indiana.

27.     Defendant Susan Thronson ("Thronson"), 51, has been a member of the Company's Board of Directors since November 2012. Thronson is a member of the Board's Audit Committee. Thronson received fees, stock awards, and options awards totaling $30,833 from Angie's List in 2012. She is a citizen of California.

28.     Defendants Oesterle, Hicks Bowman, Biddinger, Britto, Chuang, Kapner, Krach, Lee, Maurer, and Thronson are sometimes referred to herein collectively as the "Director Defendants."

## **GENERAL FIDUCIARY DUTIES OF THE DEFENDANTS**

29.     The Defendants had stringent fiduciary obligations to Angie's List and its shareholders.

30.     By reason of their positions as officers, directors and/or fiduciaries of Angie's List and because of their ability to control the business and corporate affairs of Angie's List, the Defendants owed Angie's List and its shareholders fiduciary obligations of loyalty, good faith, due care, disclosure, candor, and oversight, and were and are required to use their utmost ability to control and manage Angie's List in a fair, just, honest and equitable manner.  The Defendants were and are required to act in furtherance of the best interests of Angie's List and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

31.     Each director and officer of the Company owes to Angie's List and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and to uphold the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company.

32.     The Defendants, because of their positions of control and authority as directors and/or officers of Angie's List, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public

statements issued by the Company.   Because of their advisory, executive, managerial and directorial positions with, each of the Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Angie's List and its assets.

33.   At all times relevant hereto, each of the Defendants was the agent of each of the other Defendants and of Angie's List, and was at all times acting within the course and scope of such agency.   To discharge their duties, the officers and directors of Angie's List were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the operational affairs of the Company.   By virtue of such duties, the officers and directors of Angie's List were required to, among other things:

- conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the Company's value;

- properly and accurately guide shareholders and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

- ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

- ensure that there were sufficient checks and balances in Angie's List's accounting and finance functions, and related functions, to prevent accounting irregularities, internal control problems, and/or overstatement of revenue and/or income;

- ensure that no inaccurate financial information about Angie's List was released to the public that would tend to artificially inflate Angie's List's stock, and that would thus cause corresponding or greater harm to the Company's value when the truth was revealed; and

- ensure that no usurpation of corporate opportunities took place by Company insiders and directors, and that the Company's interests were placed before those of any individual director.

34.     Each of the Defendants, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, due care, disclosure, candor, and oversight in the management and administration of the affairs of the Company.  The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Angie's List, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders.  The Defendants were aware, or should have been aware, that those violations, absences of good faith, and/or the reckless disregard of duties posed a risk of serious injury to the Company.  The conduct of the Defendants who were also officers and/or directors of the Company has been ratified by the remaining Defendants.

35.     Because of their positions with the Company, and their access to material non-public information available to them but not to the public, Angie's List, through the Defendants,

knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.

## SPECIFIC FIDUCIARY DUTIES OF THE DEFENDANTS

36.    Aside from their legally imposed duties as officers and/or directors of a publicly traded company organized under Delaware law, Defendants were also subject to particularized duties pursuant to specific policies in effect at Angie's List.

### Duties Arising from Angie's List's Code of Business Conduct and Ethics

37.    Angie's List's Code of Business Conduct and Ethics (the "Code") imposes substantial duties upon all of Angie's List's Officers, Directors, and Employees.  The Code states, in pertinent part:

> ***We must strive to foster a culture of honesty and accountability.  Our commitment to the highest level of ethical conduct should be reflected in all of the Company's business activities including, but not limited to, relationships with employees, members, service providers, competitors, the government and the public, including our stockholders***.  All of our employees, officers and directors must conduct themselves according to the language and spirit of this Code and seek to avoid even the appearance of improper behavior.  Even well-intentioned actions that violate the law or this Code may result in negative consequences for the Company and for the individuals involved.

> One of our Company's most valuable assets is our reputation for integrity, professionalism and fairness.  We should all recognize that our actions are the foundation of our reputation and adhering to this Code and applicable law is imperative.

> \* \* \*

> ***All directors, employees and contractors . . . of the Company and its subsidiaries are expected to comply with this policy***, unless otherwise indicated.

> \* \* \*

> ***We are strongly committed to conducting our business affairs with honesty and integrity and in full compliance with all applicable laws, rules and regulations***.

No Angie's List Worker shall commit an illegal or unethical act, or instruct others to do so, for any reason.

\* \* \*

**5. *Trading on Inside Information***

***Using non-public Company information to trade in securities*** or providing a family member, friend or any other person with a "tip" ***is illegal and unethical. All such non-public information should be considered confidential or inside information and should never be used for personal gain***.  You are required to familiarize yourself and comply with the Company's policy against insider trading, copies of which are distributed to all Angie's List Workers and are available from the Chief Financial Officer.   You should contact the Chief Financial Officer with any questions about your ability to buy or sell securities.

\* \* \*

**12. *Quality of Public Disclosures***

***The Company has a responsibility to provide full and accurate information in our financial reporting and public disclosures, in all material respects, including regarding the Company's financial condition and results of operations.  Our reports and documents filed with or submitted to the Securities and Exchange Commission and our other public communications shall include full, fair, accurate, timely and understandable disclosure***, and the Company has established a Disclosure Committee consisting of senior management to assist in monitoring such disclosures.  [Emphases added.]

**Duties Arising from the Company's Insider Trading Policy**

38.     Defendants also undertook duties against trading on material, non-public information of Angie's List by virtue of the Company's Amended and Restated Insider Trading Policy and Memorandum, most recently updated on March 15, 2013 (the "Insider Trading Policy").

39.     The Insider Trading Policy provided in pertinent part as follows:

- Angie's List Workers may not disclose material inside information to anyone, except to persons within Angie's List whose positions require them to know it.

- ***No Angie's List Worker may place a purchase or sale order, or recommend that another person place a purchase or sale order in our securities when he or she has knowledge of material information concerning Angie's List that has not been disclosed to the public***. This includes orders for purchases and sales of our common stock and any other securities we may issue, such as preferred stock, warrants and convertible debentures, as well as derivative securities relating to our securities, whether or not issued by us, such as exchange-traded options. The exercise of employee stock options is not subject to this policy; however, ***stock that was acquired upon exercise of a stock option will be treated like any other stock, and may not be sold by an employee who is in possession of material inside information***.

- Angie's List Workers must not engage in any hedging transactions designed to hedge or speculate on any change in market value of our equity securities.

- Angie's List Workers must not purchase our securities on margin or hold our securities in a margin account.

- No Angie's List Worker should place a purchase or sale order, or recommend that another person place a purchase or sale order, in the securities of another corporation, if the Angie's List Worker learns in the course of his or her employment confidential information about the other corporation that is likely to affect the value of those securities.

\* \* \*

All Angie's List Workers should pay particularly close attention to the laws against trading on "inside" information. These laws are based upon the belief that all persons trading in a company's securities should have equal access to all "material" information about that company. For example, ***if an Angie's List Worker knows material non-public financial information, he or she is prohibited from buying or selling our stock until the information has been disclosed to the public. This is because the Angie's List Worker knows information that will probably cause the stock price to change, and it would be unfair for the Angie's List Worker to have an advantage (knowledge that the stock price will change) that the rest of the investing public does not have***. In fact, it is more than unfair—it is considered to be fraudulent and illegal. Civil and criminal penalties for this kind of activity are severe.

\* \* \*

***Inside information does not belong to the individual directors, officers or other employees who may handle it or otherwise become knowledgeable about it. It is an asset of Angie's List. For any person to use such information for personal***

*benefit or to disclose it to others outside Angie's List violates our interests. More particularly, in connection with trading in our securities, it is a fraud against members of the investing public and against Angie's List.*

\* \* \*

*The prohibition against trading on inside information applies to directors, officers* and all other employees, and to other people who gain access to that information. The prohibition applies to both domestic and international employees of Angie's List and its subsidiaries. In addition, directors and certain employees with inside knowledge of material information may be subject to ad hoc restrictions on trading from time to time.

\* \* \*

<u>Trading in Our Securities.</u>  *No Angie's List Worker may place a purchase or sale order, or recommend that another person place a purchase or sale order in our securities when he or she has knowledge of material information concerning Angie's List that has not been disclosed to the public.* This includes orders for purchases and sales of stock and convertible securities. The exercise of employee stock options is not subject to this policy.  However, *stock that was acquired upon exercise of a stock option will be treated like any other stock, and may not be sold by an employee who is in possession of material inside information.* Any Angie's List Worker who possesses material inside information should wait until the start of the third business days after the information has been publicly released before trading.  [Emphases added.]

### Duties Arising from the Charter of the Audit Committee

40.    Defendants Biddinger, Maurer, and Thronson were members of the Audit Committee during the relevant period.  As such, they had duties to assist the Board, among other things, in its oversight of:

- the integrity of the financial statements of the Company;

- the qualifications, independence and performance of the Company's independent auditor;

- the performance of the Company's internal audit function; and

- compliance by the Company with legal and regulatory requirements.

41.     In addition, the charter of the Audit Committee contains specific areas of responsibility for members of the Audit Committee, including the duties to:

- meet to review and discuss with management and the independent auditor both the annual audited and quarterly financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" prior to the filing of the Company's annual (Form 10-K) or quarterly (Form 10-Q) filings;

- review the Company's earnings press releases prior to public dissemination, the type and presentation of information included in the Company's press releases, as well as financial information and earnings guidance provided to analysts and ratings agencies and any of the Company's other financial disclosures;

- review the Company's policies with respect to risk assessment and risk management, including discussing with management the Company's major financial risk exposures and the steps that have been taken to monitor and control such exposures;

- oversee compliance with the Company's Code of Business Conduct and Ethics; and

- review the Company's compliance with laws and regulations, including the Company's corporate securities trading policy and any major legal and regulatory initiatives.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

42.     In committing the wrongful acts alleged herein, the Defendants have pursued, or joined in the pursuit of, a common course of conduct.  They have acted in concert with and

conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Defendants also aided and abetted, and/or assisted, each other in breach of their respective duties.

43.     During all times pertinent hereto, the Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the material, non-public information detailed herein concerning Angie's List's business model, financial results, and projected results.

44.     The purpose and effect of the Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Defendants' violations of state law, including breaches of fiduciary duty, abuse of control; and to conceal adverse information concerning the Company's true financial position while selling off massive stakes in the company.

45.     The Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by purposefully or recklessly releasing improper statements on the Company's behalf.  Because the actions described herein occurred under the Board's authority, each of the Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

46.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

47.     In 2011, the Company conducted an initial public offering ("IPO") of common stock and currently has approximately 58 million shares of common stock outstanding.  During the first two years of its existence as a public company, Angie's List stock traded between approximately $10 and $18 per share.  In 2013, however, the stock price experienced a meteoric rise, reaching a peak of $28 per share on July 1, 2013 and trading between $21 and $28 per share for the following three months.

48.     But, unbeknownst to shareholders until very recently and contrary to Defendants' repeated assurances to shareholders, nineteen years after its founding the Company apparently has no long-term business model for achieving the increasing revenues it needs in order to become profitable.  The Company has largely depleted the proceeds from its 2011 IPO and has negative shareholder equity.  It faces stiff competition from other "crowd-sourced" user-review websites such as Yelp.com, Google Reviews, HomeAdvisor.com, and Thumbtack.com.  These companies, which feature websites that are free to consumers, are growing revenues far more consistently than Angie's List, and they feature dynamic business models that do not (as Angie's List does) depend on legacy promises not to accept advertising or not to let advertising determine the placement and presentation of customer reviews—promises which even Angie's List has covertly begun to break.

49.     Indeed, shareholders have learned that the Gordian Knot at the heart of Angie's List's is the conflict between, one the one hand, a base of paying members who provide non-anonymous, verified reviews of service providers (thus contributing an aspect of seriousness of purpose and objectivity that, in turn, attracts both advertisers and additional users) and, on the other hand, the availability of no-cost or far-lower-cost competitors.  This conflict places an

upper limit on the number of subscribers the Company can ever realistically expect to achieve. As paying subscriber growth has stalled, Defendants, unbeknownst to shareholders, recently attempted to reduce the Company's membership prices by 75% or more in major markets so as to inflate the Company's subscriber numbers and attract more advertisers—even as this contradicted the Company's founding principle that "You can't pay to be on Angie's List" and turns the Company into just one more, "expensive, publicity-based 'web-magazine,'" in the words of one analyst.[2]   The market reaction to this move was so negative (slashing the Company's share price by 17.5% in a single trading day) that Defendants were forced to abandon it.

50.    Defendants have never disclosed their lack of a viable business model to shareholders, nor have they come forth with information that would allow such shareholders to appreciate the falsity of Defendants' claims that Angie's List is member-supported and thus that its end users are provided with a uniquely objective source of information about local business providers from others users like themselves.   In reality, Angie's List has been primarily supported and will for the foreseeable future be primarily supported by <u>advertising</u> paid for by the very service providers under review.   Moreover, such service providers have come to play a dominant role in the placement and even the content of user reviews that are made available to other members.

51.    Instead, Defendants have issued a series of statements to public shareholders touting the Company's momentary increases in revenues and other metrics and concealing the fundamental structural problems that have prevented it from achieving profitability and that, barring a miracle, will prevent it from reaching profitability in the future.   And—critically—

---

[2]     Pedro de Almeida, "Angie's List's Big Problem," *Seeking Alpha* (June 17, 2013) (last visited Jan. 1, 2014).

many of the Defendants, including co-founders Oesterle and Hicks Bowman—have been dumping their personal holdings of Angie's List stock timed to take advantage of the recent (but ephemeral) strength in the Company's share price, based on their knowledge of the material, non-public information that they have concealed from other shareholders.

52.     On February 13, 2013, Defendants caused Angie's List to issue a press release announcing results for the fourth quarter of 2012 and year-end 2012.  This release was entitled "Angie's List Reports Fourth Quarter and Fiscal Year 2012 Results

- *Fourth quarter revenues increased to $46.2 million, up 68% over the prior year quarter*

- *Fourth quarter service provider revenue increased to $32.5 million, up 83% over the prior year quarter*

- *Cost per acquisition ("CPA") in the fourth quarter was $39, a decrease of 24% over the prior year period*

- *Fiscal year 2012 revenues increased to $155.8 million, up 73% compared to fiscal year 2011*

- *Total paid memberships of 1,787,394 at December 31, 2012, up 66% year-over-year*".  [Italics in the original.]

The release further featured a quotation by Defendant Oesterle:  "We had a great fourth quarter concluding an exceptional year. . . .   Entering 2012, we set specific operational objectives, and we exceeded them.  We made significant investments in our business during the year and achieved meaningful strides in *our ability to monetize our membership base*. . . .  We saw continued improvement in each of our cohorts marked by *strong membership growth, higher penetration rates and increasing average revenue per market*. . . .  The operating characteristics of our oldest cohort *continue to demonstrate the potential for the entire business*."  (Emphases added.)  The release went on to describe year-end results:

> Our total 2012 revenue was $155.8 million, an increase of 73% from $90.0 million in the prior year period. Membership revenue of $47.7 million increased 41% year-over-year and service provider revenue of $108.1 million increased 92% compared to the prior year period. We increased our marketing expense 43%, or $24.1 million, over the prior year period while decreasing our CPA to $73 from $78. We added a total of 1,092,935 new gross paid memberships in 2012, compared to adding 716,350 in 2011.

Defendants announced guidance for the first quarter of 2013 as follows:

- Total revenue in the range of $51.0 million to $52.0 million for the first quarter of 2013.

- Marketing expense in the range of $19.0 million to $20.0 million for the first quarter of 2013.

53.     Following these falsely optimistic disclosures and a similarly misleading earnings conference call with securities analysts that evening led by Defendants Oesterle, Hicks Bowman, and Millard, the market responded positively the next day, adding $3.26 to Angie's List's share price, to close at $16.86 per share on February 14, 2013 on heavy trading volume.

54.     *Bloomberg* and *Investor's Business Daily* published articles giving additional publicity to Defendants' misleading statements.   In "Angie's List Gains Most Since 2011 Trading Debut," *Bloomberg* reported that the Company's share price "surged to the highest price in more than 10 months after forecasting sales that beat estimates ***as more members pay to use the service***." (Emphasis added.)  *Bloomberg* quoted a Raymond James securities analyst to the effect that "[l]ower marketing costs and a bigger base of paid service providers have positioned the company to rapidly grow revenues and boost investment in new products and technology," as a result of which Raymond James had upgraded Angie's List to "Buy."  For its part, *Investor's Business Daily* reported that the market's positive reaction was due to the Company "paying less in marketing cost to attract new subscribers."

55.    Defendants caused Angie's List to file its Form 10-K annual report for 2012 with the SEC on February 25, 2013.   In this filing, which was signed by each of the Director Defendants except Britto and Kapner, Defendants caused Angie's List to aver as follows:

> We generate revenue from both our members and our service providers.   We derive membership revenue from subscription fees and, in certain cases, non-refundable initiation fees for monthly, annual and multi-year memberships.   These fees typically are charged in advance.   Subscription fees are recognized ratably over the subscription period and initiation fees are recognized ratably over the expected life of the membership.   As of December 31, 2012, approximately 91% of our total membership base had purchased annual or multi-year memberships. ***These subscription fees represent a significant source of working capital and provide a relatively predictable revenue stream***.
>
> We derive service provider revenue principally from term-based sales of advertising to local service providers.   Our members grade local service providers on an "A" to "F" scale, and we invite local service providers with an average grade of "B" or better and at least two reviews submitted in the last three years to advertise to our members through any or all of our website, email promotions, monthly magazine and call center.   As of December 31, 2012 approximately 332,000 local service providers rated by our members were eligible to offer discounts and other promotions to our members based on these criteria.   Service provider contracts can be prepaid or invoiced monthly at the option of the service provider and carry an early termination penalty.   We recognize service provider revenue ratably over the period in which an advertising campaign is run.   We are expanding our service provider sales force to drive increased service provider revenue. ***Our high service provider renewal rates, both in number of service providers renewing and as a percentage of initial contract value renewed, have provided us with a relatively predictable revenue stream***.   [Emphases added.]

56.    Defendants also highlighted the purported success the Company was experiencing in "monetizing"—i.e., generating cash from—its ever growing memberships and advertising sales to service providers:

> As described further in the "Market Cohort Analysis" below, ***we believe that our estimated penetration rate and average revenue per market will increase as markets mature, and over the long term, we believe that these increased revenues will more than offset our operating expenses***. In addition, our advertising spending, which is our single largest operating expense, is related to the acquisition of new members, rather than the maintenance of existing members. Because our advertising contracts typically are short-term, we can rapidly adjust marketing expense, and thus decrease total operating expenses to reduce cash used in operations or generate cash and profits from operations

23

should we begin to experience adverse trends in marketing cost per paid membership acquisition or wish to optimize for profitability at the expense of rapid growth. *We believe that our high membership renewal rates and "word of mouth" referrals from existing members*, combined with effective purchasing of lower volumes of advertising and increasing utilization of search engine optimization, or SEO, *would enable us to maintain and potentially grow the size of our paid membership base at a lower level of overall advertising spending*.

\* \* \*

**Market Cohort Analysis**

To analyze *our progress in executing our expansion plan*, we compile certain financial and operating data regarding markets we have entered grouped by the years in which the markets transitioned to paid membership status. The table below summarizes this data for 2012 by the following cohorts. The pre-2003 cohort includes our ten most established markets, where we initially built out our business model. The markets in this cohort include several mid-sized urban markets in the midwest as well as Chicago and Boston. The 2003 through 2007 cohort includes the first major subset of markets, including many of our largest potential markets, that we targeted in our national expansion strategy. *The markets in these older cohorts have begun to achieve penetration rates that allow us to transition beyond introductory membership and advertising rates*. The 2008-2010 and post-2010 cohorts include markets that have most recently converted to paid status and that still have predominantly introductory membership and advertising rates. The markets in these cohorts generally are smaller markets that we entered to fill out our national presence.

| Cohort | # of Markets | Avg. Revenue/ Market | Membership Revenue/Paid Membership | Service Provider Revenue/Paid Membership | Avg. Marketing Expense/ Market | Total Paid Memberships | Estimated Penetration Rate | Annual Membership Growth Rate |
|--------|-------------|--------------------|----------------------------------|----------------------------------------|-------------------------------|----------------------|--------------------------|------------------------------|
| Pre-2003 | 10 | $ 4,689,796 | $ 43.08 | $ 111.48 | $ 1,241,670 | 358,180 | 8.5% | 44% |
| 2003-2007 | 35 | 2,716,037 | 37.59 | 85.12 | 1,292,726 | 973,101 | 6.3% | 69% |
| 2008-2010 | 103 | 125,483 | 15.86 | 23.66 | 182,286 | 414,710 | 6.5% | 73% |
| Post 2010 | 71 | 10,606 | 12.92 | 16.05 | 52,555 | 41,403 | 3.3% | n/a |
| Total | 219 | | | | | 1,787,394 | | |

(Emphases added; footnotes in chart omitted.)

57.    On March 14, 2013, Angie's List disclosed that Defendant Millard would step down as CFO at the end of the current quarter and that Defendant Hundt would serve as interim CFO until a replacement could be named.  In addition, the Company disclosed that Defendant

Hicks Bowman had been granted a seat on the Board of Directors, making her one of only a few marketing heads who sit on their companies' boards.

58.     On April 22, 2013, Defendants caused Angie's List to issue a press release touting its membership numbers.   The release—entitled "Angie's List Surpasses 2 Million Paid Households—More Than 16 Years to 1 Million; 18 Months to 2 Million"—highlighted the purported increases the Company was making on an ongoing basis with membership numbers:

> INDIANAPOLIS, April 22, 2013 (GLOBE NEWSWIRE) – ***Continuing its aggressive member growth pattern***, national consumer review service Angie's List (Nasdaq:ANGI) has topped the 2 million, paid-households mark.
>
> Angie's List passed the 2 million mark on Sunday, April 21, 2013.
>
> "It took us more than 16 years to get to one million paid households but just 18 months to double it," said Angie Hicks, who in 1995 co-founded the company with CEO Bill Oesterle in Columbus, Ohio.
>
> "***Realizing such momentum in membership growth*** is truly a testament to our commitment to help consumers find the best local service providers," she added. "***Our members drive Angie's List***."
>
> Angie's List passed the 1 million paid household mark in October 2011 and finished March 31, 2013, with 1,951,774 paid households nationwide.  [Emphases added.]

59.     On April 24, 2013, Defendants caused Angie's List to issue a press release announcing results for the first quarter of 2013.   This was entitled "Angie's List Reports First Quarter 2013 Results

- *First quarter revenues increased to $52.2 million, up 68% over the prior year quarter*

- *First quarter service provider revenue increased to $37.5 million, up 78% over the prior year quarter*

- *Cost per acquisition ("CPA") in the first quarter was $72, a decrease of 12% over the prior year period*

- *Total paid memberships of 1,951,774 at March 31, 2013, up 60% year-over-year*

- *First quarter cash provided by operations of $9.9 million*".   [Italics in the original.]

The release quoted Defendant Oesterle as follows:

> "**Our business grew very well in the first quarter, achieving new records for membership, service provider revenue and total revenue, due to continued strong and consistent operating metrics**," said Angie's List CEO Bill Oesterle. "We **continue to gain operating leverage and produced cash flow from our operations**. Our first quarter performance **demonstrates our ability to continue to rapidly grow our business and produce cash flow**, while simultaneously, and significantly, increasing our investments in technology and products. These results **reinforce our confidence in our strategy and the long-term operating and financial results we expect to produce**."
>
> \* \* \*
>
> "Our cohorts continued to perform very well in the first quarter," continued Oesterle. "**Each cohort recorded significant membership growth with higher penetration rates and increasing total revenue per average paid member**." [Emphases added.]

The release also quoted Defendant Hundt as follows:

> "We remain focused on **our unit economics** and they **continued to improve in the first quarter**," said Chuck Hundt, Interim Chief Financial Officer. "We are pleased with the **continued leverage we have achieved as well as our cash generated from operations during the period**. We will continue to invest in acquiring new members, adding advertising service providers and innovating products to drive further scale and penetration, while maintaining secure levels of liquidity." [Emphases added.]

The release went on to project second quarter 2013 revenues in the $58.5-$59.5 million range and marketing expenses in the $27.8-$28.8 million range.

60.     The Company's purported successes in executing on Defendants' business model once again drew the admiration of the press. *Associated Press* reported that although analysts had expected a loss of $0.17 per share on revenues of $51.6 million, Angie's List had achieved a loss of only $0.14 per share on revenues of $52.2 million. *Associated Press* further noted that although marketing expenses had increases 12 percent to $19.7 million, the expenditures were "***paying off in more subscribers and increased revenue***." **(**Emphasis added.**)**

26

61.    Following these falsely optimistic disclosures and a similarly misleading earnings conference call with securities analysts that evening led by Defendants Oesterle, Hicks Bowman, and Hundt, the market responded positively the next day, adding $5.81 to Angie's List's share price, to close at $25.92 per share on April 25, 2013 on heavy trading volume.

62.    On July 24, 2013, Defendants caused Angie's List to issue a press release announcing results for the second quarter of 2013.   This was entitled "Angie's List Reports Second Quarter 2013 Results

- *Second quarter revenues increased to $59.2 million, up 62% over the prior year quarter*

- *Second quarter cash provided by operations of $4.3 million; cash provided by operations for the six months ended June 30, 2013 of $14.2 million*

- *Cost per acquisition ("CPA") in the second quarter was $80, a decrease of 12% compared to the prior year period*".  [Italics in the original.]

The release quoted Defendant Oesterle as follows:

"***We are reporting record levels for memberships added, service provider revenue and total revenue, as well as continued efficiencies in our cost per member acquired***," said Angie's List CEO Bill Oesterle. "We achieved these results ***while simultaneously improving our operating leverage and producing cash flow***."

\* \* \*

"We recorded ***very good performance from each of our cohorts in the second quarter***," continued Oesterle. "***Each cohort recorded strong membership growth, higher penetration rates, and increasing average revenue per market and contribution***."  [Emphases added.]

The release also quoted Defendant Hundt as follows:

"We achieved record results in our financial and operating metrics, highlighted by a 40 percent improvement in our operating leverage and continued cash generation," said Chuck Hundt, Interim Chief Financial Officer.  "Our second quarter financial results, along with our strong operating metrics, demonstrate that ***our strategy continues to deliver growth and gives us confidence as we continue to invest in acquiring new members and advertising service providers and develop innovative products***."  [Emphasis added.]

The release went on to project third quarter 2013 revenues in the $65.6-$66.5 million range and marketing expenses in the $28.1-$29.1 million range.  That evening, Defendants Oesterle, Hicks Bowman, and Hundt conducted an earnings conference call and provided additional positive comments about the Company's successes in executing its business model and in driving record results.

63.     Each of the statements described above was materially false and misleading, in breach of Defendants' fiduciary duties to shareholders—including the duties of candor and fair disclosure—in that:  (i) the Company's business model no longer allowed for significant overall growth without membership increases yet the rate of membership growth was stalling; (ii) the Company had resolved to increase its reliance on providing free and reduced-price memberships in order to artificially boost its subscriber figures; (iii) the Company had come to derive a majority of its revenues from the service provider side of its business, where it collected fees for advertising and for listing paid service providers more prominently, contrary to its statements that it did not permit service providers to pay for better coverage on its website; (iv) the Company's charges to service providers for providing "hot leads" to Angie's List customer's jobs were so high (forcing these providers either to artificially inflate their normal prices to customers at the price of their and Angie's List's integrity or to retain their integrity at the price of foregoing customers referred by Angie's List) as to prevent "hot leads" from serving as a viable long-term revenue stream; (v) even increased reliance on advertising revenues could not solve the Company's long-term liquidity challenges given that advertising revenues are tied to membership levels and the growth rate of such levels at Angie's List were declining; (vi) the Company's marketing expenses were growing at an unsustainable rate; (vii) the Company had entered the payment processing business, having begun to serve as a payment conduit between

service users (Angie's List members) and service providers, taking a hefty commission on as many jobs as possible; and (viii) the Company did not vet the service providers listed and recommended on its website, and frequently deleted or "white-washed" negative reviews by consumers, in both cases eroding consumers' confidence in the value of the recommendations appearing on the site.

## THE TRUTH EMERGES

64.    The true facts concerning Defendants' false and misleading statements about Angie's List did not begin to emerge until after the end of the third quarter of 2013.

65.    Thus, on October 2, 2013, near the close of the trading day, an article entitled "Cheaper Advice:  Angie's List Cuts Prices" appeared in the *Wall Street Journal*.  This article revealed publicly for the first time as follows:

> Consumer-review site Angie's List Inc. has **slashed membership prices by roughly 75% in several key markets, in a bid to attract new members**.

> Chief Executive William Oesterle told The Wall Street Journal that new members in New York, Washington D.C., Chicago, San Francisco and Indianapolis, among other markets, are **now paying around $10 for an annual membership, down from around $40**.

> "We have a reduced-price test running" in several markets, Mr. Oesterle said. He said executives are "trying to understand the impact on member acquisition and retention."

> **News of the price cuts**, which **have not been previously reported**, come two days after Angie's List said Chief Technology Officer Manu Thapar had left the company. The disclosure, late Monday, contributed to a nearly 10% drop in Angie's List shares on Tuesday. On Wednesday, the shares traded up 3.5% in afternoon trading.

> In the interview, Mr. Oesterle said that "the demands of the job had outgrown our CTO." He added that the company wants its technology chief to be located at its Indianapolis headquarters to help guide a transition in its business. Mr. Thapar, who didn't respond to an email seeking comment, was based in California.

The transition is ***an effort by the company to build an online marketplace whereby those looking for home services like carpet-cleaning can pay Angie's List, rather than the service provider***. Historically, Angie's List has simply provided online listings, like the Yellow Pages, but not handled transactions.

***Under the new model, Angie's List pays the service provider***. Mr. Oesterle says that there were 116,000 transactions of this type on his site in the second quarter, generating $21 million of total sales, of which Angie's List kept $5 million. The company reported $59 million in revenue for that quarter.

The price cuts would continue a trend for the company. Per-subscriber fees declined to $31.72 in the second quarter, from $49.57 in the fourth quarter of 2010.

***The company also generates revenue from service providers who advertise on the site***. That revenue has increased to $79.36 per subscriber, from $66.55, over the same period.

Customers that sign up at the new lower prices will not face higher prices when they renew, according to Mr. Oesterle: "The price you sign up at is the one you'll get renewed at."

But the CEO said the lower prices would not immediately be available to older subscribers.  Complaints from existing subscribers about renewing at higher prices will be handled on a "one-off basis," said Mr. Oesterle.  He added that "if we decide to permanently move the price point, then we'll adjust everyone."

***Angie's List says that its members are more valuable for advertisers in part because they pay subscription fees***. That is unlike a site like Yelp, where users need not pay to read business reviews. "It's important that people pay, but we want to lower the friction point for them participating as a paid member," Mr. Oesterle said.  [Emphases added.]

66.     In response to the news that Angie's List was effectively abandoning its membership-fee-based business model to inflate subscriber counts, the Company's share price declined precipitously, dropping $3.68 per share (almost 18%) to $17.31 per share on October 3, 2013, on unusually high trading volume.

67.     The belated disclosures continued after the close of trading on October 23, 2013, when Angie's List issued a press release concerning its third quarter 2013 financial results and projections for the fourth quarter of 2013.  The Company disclosed that its third-quarter revenues

were only $65.5 million—lower than the expectations of securities analysts, whose mean estimate of revenues was no less than $66.1 million (and some of whom who expected substantially higher revenues).  The Company also reported that its quarterly net <u>losses</u> had substantially exceeded analysts' expectations—totaling $13.5 million, or $0.23 per share, versus consensus expectations of losses at only $0.20 per share.  Further, the Company projected fourth quarter revenues of $68-$69 million, missing analysts' expectations, who as a group expected forecasted revenues for that period of no less than $70.4 million.  In addition, the Company reported that marketing expenses had increased $2.1 million, or 8 percent, compared to the prior year's third quarter.  Finally, Angie's List reported that it had gained only 371,318 new subscribers, bringing the total to 2,378,867—a paltry 10% increase during the third quarter and far lower than the quarter-over-quarter increases of 20% and 16%, respectively, that the Company had experienced in similar periods in 2011 and 2012.

68.    The following morning, October 24, 2013, respected stock market commentator *Seeking Alpha* published an article entitled "Angie's List—A Deferred Value Train Wreck." This article reported that Angie's List was dramatically overvalued in the market, and that the Company's third-quarter results had demonstrated that it was experiencing "declining business metrics," its balance sheet was "underwater," and that a "massive restructuring to avert bankruptcy" was possible "inside a year."  That same day, B. Riley & Co., a securities analyst, downgraded Angie's List from "Buy" to "Neutral."  And *The Motley Fool*, a widely read stock market commentary website published an article entitled "Should Investors Stay Off Angie's List?"  The *Motley Fool* article reported as follows:

> ***Angie's List*** (NASDAQ: ANGI) ***may claim its clients love the access to vetted professionals—from plumbers to anesthesiologists—but the company and stock are a bit more difficult to feel positively about***.  The Web-based subscription-referral business trades at more than 50 times its forward earnings and has been

accused more than once of using murky business practices.   On Wednesday, shares fell even though the company met the Street's expectations on the top and bottom lines, but it failed to satisfy forward-looking estimates.   ***The company needs to reign in its expenses and improve public perception before investors will take to the rich earnings multiples implied in Angie's stock price***.

Review

Shares were down nearly 8% after hours on Wednesday due to Angie's List's just-ended quarter.  The company lost a net of $13.5 million in its fiscal third quarter, or $0.23 per share.  Analysts had been expecting $0.03 better. Revenue was less disappointing at $65.5 million, where analysts were expecting $66.1 million.  The net loss also comes in as a decent improvement over the prior year's loss of $0.32 per share.

To end the year, Angie's List is looking at top-line sales in the neighborhood of $68 million to $69 million, whereas the market wanted $70 million.

The two misses, EPS and guidance, were not too damning, but ***analysts are concerned that the company is struggling to control its costs***, prompting the major sell-off.   In the third quarter, marketing expense ticked up another $2 million to $28.2 million. Management guided for lower marketing spend in the final quarter of the year.

***Where it stands now, Angie's List offers investors little in the form of cash flow and a business model that may depend too heavily on aggressive sales and marketing practices -- all for a price (see above forward earnings ratio) that rivals even some highly profitable technology businesses***.  Do the bulls know something the rest of us don't?

Questions

. . . Angie's List has come under fire by outspoken short-sellers, such as Citron Research.    Citron alleged ***the company's customers were increasingly dissatisfied with the service, and alleged that the so-called evaluation process of its chosen businesses was simply a matter of taking a check in exchange for favorable site position -- with little to no investigation into the quality of the referred party***.  Obviously, the foundation of the Angie's List business model is that it weeds out the contractors, doctors, and other professionals that consumers might want to avoid, and instead directs them to the best of breed.   ***If consumers lose trust in Angie's List's vetting process, the whole thing goes kaput***.

One of the company's executives has taken flight recently, adding to the storm. Chief Technology Officer Manu Thapar left the company abruptly and with no explanation.  Around the same time, ***the company had randomly cut prices in***

32

*major markets by up to 75%, prompting outrage from investors left in the dark*. Management simply said it was practicing different price strategies.

At best, Angie's List appears to be a growing business (attractive top-line growth) experiencing some growing pains as a public company. *It is not particularly shareholder-friendly, its actions appear rash and go unexplained, and its fundamentals are barely sturdy enough for even the most risk-seeking investor*. To assign an Angie's List-style grade to the company itself, a C would be pushing it. [Emphases added.]

69.     In response to these reports, the share price of Angie's List fell yet further to $13.41 by the close of trading on October 25, 2013—a two-day decline of nearly 14 percent.

70.     News and investment commentary appearing later in the fall of 2013 revealed the fundamental corruption of Angie's List purported "members-first" philosophy at the hands of Defendants.

71.     For example, on December 16, 2013, an article in *Seeking Alpha*, "Angie's List: An Update On Growth Evolution, And Some Predictions," reported as follows:

*ANGI's "membership" growth is stalling. Its business model does not allow for significant overall growth without membership increases.   Competition is already strong, seems to have better business models, and still new competitors for the same client base keep showing up*.

\* \* \*

ANGI gets most of its revenues from service providers' "advertising", and not from client memberships (in fact, service providers pay for more than just ordinary advertising: subjected to some restrictions, *they can effectively pay to be placed on the top of ANGI's ordered list of recommended providers*, as shown to its paying final clients/members!).  *Since most of ANGI's revenue comes from this (very dubious) scheme and only some 25% comes from paid memberships*, some have argued that the fact that ANGI's membership growth is slowing so fast is not very relevant.

*I disagree with this point of view. I believe that the only motivation for service providers spending in "advertising" is to reach the client base formed by ANGI's "members". If their numbers stop growing (and stabilize, say, around 3 million) then "advertising" from service providers will likely also stabilize*. [Emphases added.]

72.     On December 21, 2013, an article in the *New York Times* exemplified how under Defendants' direction, Angie's List had actually instituted a policy of "white washing" negative reviews on behalf of paying service providers and thus artificially inflating their reputations in the website's community.   The article, a submission in a regular column responding to reader questions called "The Haggler," was entitled "A Complaint Registered, Then Expunged" and detailed how Defendants' policy works:

> In this episode we look at Angie's List, and, up front, the Haggler should probably confess that he is very jealous of Angie.   Why?   Because she has her own list!   It's a website of crowd-sourced reviews of local businesses.   Essentially, Angie's List is an online compendium of thumbs ups and thumbs down, or put more succinctly, a list of who's naughty and nice.

> You know who else has a list like that?   Santa. . . .

> There is no Haggler's List.   Know why?   Because the Haggler is interested only in who's been naughty.   Nobody wants to be on the Haggler's List.   Including Angie.

> **Q.**   I had a ridiculously hard time getting a $257 refund from Shamrock Overhead Door, a contractor based in Norwood, Mass., that I found through Angie's List.   I opened a dispute on the Angie's List site, where I noticed that a couple other consumers had similar problems.   An Angie's List agent did a good job brokering a settlement, and eventually I got my money back.   But Shamrock even made that unpleasant.   It took weeks, and the first check sent by the company bounced.

> ***It bothers me that once I had my refund, all trace of my original complaint vanished from Angie's List***.   Just as bad, ***my options for leaving new feedback about the contractor were limited to a rating of A or B in all categories***.   I could not describe the original dispute.   Once a member benefits from intercession of an Angie's List rep, any record of past disputes is essentially expunged.   Today, Shamrock has an Angie's List "Super Service Award" badge.

> This doesn't seem right.   Next to "disputes" on Shamrock's scorecard, it now reads "zero."   Which means there is no way to tell the difference between a company that has never had a dispute and one which has had 10 of them opened and settled in the last few months, or hundreds over the years.   Apparently, Angie's List is more interested in retaining this contractor's business than protecting consumers.

> [Reader name omitted], Cambridge, Mass.

**A.**  First, some background.  Angie's List is a publicly traded company, founded in 1995 by Angie Hicks and William Seelye Oesterle, and based in Indianapolis. Consumers join by paying an activation fee of $10 or so, then anywhere from $2.60 to $5.20 a month.   They review businesses in their area — services for lawns, cars and so on; the reviews are never anonymous.

This sounds like a smart way to get collective wisdom about contractors worth hiring — more trustworthy, it would seem, than some posts on Yelp, where the posters are nameless and a mysterious algorithm is said to weed out fake reviews. But like Yelp, Angie's List also takes advertising dollars from the very local businesses being reviewed.   Some 64 percent of the company's revenue comes from advertising, according to recent quarterly results.

On its face, there is nothing wrong with taking ad dollars.  But it could complicate the balance that Angie's List seeks between consumers' desire to speak their minds and advertisers' desire to offer an unblemished version of their reputation.

***This all boils down to process, and at Angie's List, it works like this***:

When a member posts a negative review, he or she has the option of getting help from an Angie's List employee, who first asks a variation of "What would make you happy?"   Maybe it's a refund; maybe it's another coat of paint.   If the complained-about company then satisfies the consumer, that original review is deleted.   "We believe that is only right," said Cheryl Reed, a spokeswoman.   "If the company has stepped up and the member is happy, that negative review shouldn't be there."

***The member then gets a chance to post a new review, but now there are limits***.

***"The grade has to be at least a B, and while the consumer can reference the original transaction, it can't be negative***," Ms. Reed said.   "You can't say, 'I'm reviewing this company and they did a terrible job but I have to give them a B because they satisfied my complaint.'"

What is the rationale for this policy?

"We want everybody to have as much information as they can have," she said.

Now, that sounds kind of odd to the Haggler.   ***If Angie's List were interested primarily in maximizing the information available to consumers, the original negative review would be part of the permanent record***.  If the company went on to satisfy the unhappy consumer, that would be in the record, too.  And if, as was the case with [name omitted] the company's attempt at mollification added to a list of grievances, that information would be posted as well.

*The Haggler guesses that Angie's List doesn't operate with a complete-narrative ethos because it would scare off advertisers*, which include Shamrock Overhead Door. (Shamrock did not return a call from the Haggler.)  But for what it's worth, Ms. Reed said Angie's List would look at its process in light of [name omitted]'s experience.

"I'm not saying we'll change anything," she said, "but we're always taking feedback, and it often has an impact on operations."

How perfectly ambiguous and completely ungratifying.  [Emphases added.]

## INSIDER SELLING

73.     Defendants Oesterle, Hicks Bowman, Hundt, Thapar, Rutz, Krach and Maurer made personal use of the material, non-public information they possessed concerning Angie's List's true financial condition and prospects.  Among them, they sold some $17.1 million worth of Angie's List common shares, in transactions detailed herein, which were timed to take advantage of Angie's List's artificially high price.  This violated not only the Company's Insider Trading Policy but also federal law and state law.

## DERIVATIVE ALLEGATIONS

74.     Plaintiff brings this action derivatively in the right and for the benefit of Angie's List to redress injuries suffered, and to be suffered, by Angie's List as a direct result of the violations of state law, including breaches of fiduciary duty and waste of corporate assets, as well as the aiding and abetting thereof, by Defendants.

75.     Angie's List is named as a nominal defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court it would not otherwise have.  Plaintiff is and was a shareholder of Angie's List at the time of the transgressions complained of herein.  Plaintiff will adequately and fairly represent the interests of Angie's List and its shareholders in enforcing and prosecuting their rights.  Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

76.     The wrongful acts complained of herein subject, and will continue to subject, Angie's List to harm because the adverse consequences of the actions are still in effect and ongoing.

77.     The wrongful acts complained of herein were unlawfully concealed from Angie's List's shareholders.

## DEMAND FUTILITY

78.     Demand upon the Angie's List Board that they institute this action in the Company's name would be entirely futile, and is therefore excused.

79.     The Angie's List Board is comprised of ten individuals, Defendants Oesterle, Hicks Bowman, Biddinger, Britto, Chuang, Kapner, Krach, Lee, Maurer, and Thronson.

80.     A majority of this Board is incapable of objectively considering demand to bring these claims.  Each Defendant served upon a Board responsible in part for disclosing to shareholders material financial transactions involving Angie's List, and were responsible for the prudent management of Angie's List's affairs.  Each of the Defendants participated in an abnegation of these responsibilities.  Thus, there is reasonable doubt that these Defendants are disinterested because they face a substantial likelihood of liability for their actions.  As such, theses Defendants are neither disinterested nor independent, and are not capable of responding adequately to a demand.  Demand is therefore excused.

81.     Demand would be a futile and useless act because the wrongful acts complained of show an abdication by Defendants of their fiduciary duties of due care and oversight.

82.     The misconduct of the Defendants alleged herein was not, and could not have been, the product of a valid or good faith exercise of business judgment.

83.     As detailed above, the Directors were directly involved in the misconduct challenged in this action, by virtue of their respective positions on the Board.  The Directors abdicated their responsibility to oversee the Company's operations and instead directed and encouraged management, in the service of its own personal gain, to engage in illegal and/or improper conduct that rendered the Company's disclosures to shareholders and regulatory agencies deceptively misleading.  The Directors' misrepresentations and conduct lacked any legitimate business purpose and was not a product of a valid exercise of business judgment.  As such, demand is excused as futile.

84.     In addition, Defendant Oesterle is incapable of objectively considering presuit demand to bring these claims because, as CEO of Angie's List, he depends for his livelihood on his employment with Angie's List.  He received and continues to receive a lavish salary, stock option awards, and other benefits totaling $736,149 in 2012, $885,251 in 2011, and $2,017,428 in 2010.  Moreover, Oesterle, by virtue of his 70% ownership in Henry Amalgamated, has received millions of dollars personally through Angie's List's business dealings with Henry Amalgamated.  Further, because of his insider trading in Angie's List stock—amounting to nearly $12 million in ill-gotten gains—Oesterle is subject to a substantial likelihood of liability for the claims asserted herein and cannot objectively consider presuit demand to bring the claims.

85.     Defendant Hicks Bowman is incapable of objectively considering presuit demand to bring these claims because, as Chief Marketing Officer of Angie's List, she depends for her livelihood on her employment with Angie's List.  She received and continues to receive a lavish salary, stock option awards, and other benefits totaling $563,248 in 2012, $372,139 in 2011, and $4,180,606 in 2010.  Further, because of her insider trading in Angie's List stock—amounting to

over $600,000 in ill-gotten gains—Hicks Bowman is subject to a substantial likelihood of liability for the claims asserted herein and cannot objectively consider presuit demand to bring the claims.

86.     Defendant Krach incapable of objectively considering presuit demand to bring these claims because, as the CEO, President, and Chairman of Dock-Sign, he receives substantial benefits from—and stands on both sides of—Angie's List's business dealings with Dock-Sign.

87.     Several members of the Angie's List Board of Directors are defendants in one or more federal securities class actions pending in this District.  These suits were filed following Angie's List's belated disclosure of the concealed information described herein.  As a defendant in one or more securities lawsuits, these directors—who at the time of filing include Oesterle and Hicks Bowman—are incapable of objectively considering a demand that Angie's List bring these claims.  For these directors to prosecute these claims against themselves and other fiduciaries of Angie's List would compromise both their own defenses to the securities lawsuits and Angie's List's, putting the directors into an impossible conflict of interest.

88.     Defendants Chuang and Kapner—who, among themselves and an entity which they control, TRI Investments LLC, own a clear (60.3%) majority of the voting stock of the Company—are conceded by Angie's List to be non-independent.  Moreover, these directors are in a position to nominate or replace each of the other directors at will.  The other directors are thus beholden to Chuang and Kapner for the emoluments of their offices (including director compensation and the prestige of serving on the board of a high-profile firm); and because Chuang and Kapner are non-independent directors with a substantial likelihood of liability for the claims asserted herein, none of the directors can independently and disinterestedly consider a demand to bring the claims.

89.     Directors Oesterle, Hicks Bowman, Maurer, and Krach are among the corporate insiders who sold shares based on material, non-public information.  These directors plainly cannot consider a demand to bring these claims in an objective, independent, and disinterested fashion.  The insider sales alleged herein were suspicious in their timing, sequence, and amount, and demonstrate concerted action on behalf of all directors and senior officers of the Company to enrich the selling Defendants.  All of the above Defendants thus face a substantial likelihood of liability and are otherwise prevented from exercising valid business judgment as to whether to bring these claims.

90.     Directors Biddinger, Maurer, and Thronson similarly are disabled from objectively considering presuit demand to bring these claims, because as members of the Audit Committee during the relevant period, they face a substantial likelihood of liability for wrongdoing.  The Audit Committee of the Board had oversight responsibilities over the full, fair, accurate, timely, and understandable reporting of the Company's financial results, as well as over the Company's internal controls with respect to accounting and financial reporting.  Their failures of oversight as Audit Committee members allowed the Company to misrepresent its financial results as alleged herein.  In addition, as Audit Committee members, these directors had a direct responsibility for ensuring all directors compliance with Angie's List Code of Business Conduct and Ethics as well as its Insider Trading Policy—a responsibility which they evaded by allowing Defendants Oesterle, Hicks Bowman, Hundt, Thapar, Rutz, and Krach—as well as one of their own members, Defendant Maurer—to carry out massive sales of Company stock based on material, non-public information, as detailed herein.  These directors also failed in their duties to monitor and oversee the Company's major financial, legal, and regulatory risk exposures,

which have subjected the Company and various officers to liability under the federal securities laws in the *Baron* action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Breach of Fiduciary Duty for Misappropriation of Material, Non-Public Information
(Derivatively Against Defendants Oesterle, Hicks Bowman, Hundt, Thapar, Rutz, Krach
and Maurer)**

91.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

92.     Defendants Oesterle, Hicks Bowman, Hundt, Thapar, Rutz, Krach and Maurer possessed material, non-public information about Angie's List's core operations, performance, and prospects that created a substantial likelihood of an extreme departure from projected results, set forth above.  Due to these defendants' almost constant use of metrics, this information was known by them for months before it was released to the public.

93.     In response to this material, non-public information, Defendants Oesterle, Hicks Bowman, Hundt, Thapar, Rutz, Krach and Maurer engaged in significant, material sales of Angie's List shares at artificially high prices, before this information was disclosed to the investing public.  These defendants made the following sales:

(a)     Between December 27, 2012 and December 10, 2013, Oesterle sold 601,600 shares for proceeds of $11,855,282, in 50 separate transactions at prices ranging from $11.43 per share to $27.10 per share;

(b)     Between March 25, 2013 and December 26, 2013, Hicks Bowman sold 30,000 shares for proceeds of $611,141, in 10 separate transactions at prices ranging from $12.10 per share to $26.62 per share;

(c)     Between April 3, 2013 and May 22, 2013, Hundt sold 40,000 shares for proceeds of $880,850, in 8 separate transactions at prices ranging from $19.23 per share to $25.21 per share;

(d)     Between February 12, 2013 and September 23, 2013, Thapar sold 117,120 shares for proceeds of $2,034,129, in 34 separate transactions at prices ranging from $14.00 per share to $28.11 per share;

(e)     Between February 11, 2013 and April 17, 2013, Rutz sold 55,200 shares for proceeds of $956,846, in 21 separate transactions at prices ranging from $13.50 per share to $20.56 per share;

(f)     Between September 30, 2013 and December 20, 2013, Krach sold 39,000 shares for proceeds of $641,355, in 4 separate transactions at prices ranging from $15.00 per share to $23.56 per share;

(g)     Maurer sold 6,250 shares for proceeds of $99,482 on February 26, 2013, at a price of approximately $15.92 per share.

94.     These sales constituted self-dealing on the basis of confidential information belonging to Angie's List, thereby breaching these defendants' duty of loyalty to the Company and violation of the Company's own Code of Business Conduct and Ethics and its Insider Trading Policy.

95.     As a result of the misconduct alleged herein, Defendants Oesterle, Hicks Bowman, Hundt, Thapar, Rutz, Krach and Maurer are liable to the Company.  Plaintiff on behalf of Angie's List seeks the imposition of a constructive trust on, and disgorgement of, the proceeds of these defendants' insider stock sales.

96.     Plaintiff has no adequate remedy at law.

**SECOND CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(Derivatively Against All Defendants)**

97.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

98.    Each of these Defendants owed and owes Angie's List fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe Angie's List the highest obligation of loyalty, good faith, due care, oversight, fair dealing, candor and disclosure to shareholders.

99.    These Defendants, and each of them, violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, candor and disclosure to shareholders.

100.    Each of these Defendants had actual or constructive knowledge that the Company's public statements were misleading.  Defendants' directing or allowing such public statements to be made regardless could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

101.    Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving Angie's List, including their responsibilities to adequately and with all due diligence examine Angie's List's operations, financial results, and its execution of and public statements concerning its business model.

102.    In addition, by their actions alleged herein, Defendants, either directly or through aiding and abetting one another, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Angie's List in a manner consistent with the operations of a publicly held corporation.

103.    Defendants, particularly those directors on the Audit Committee, did not faithfully execute their primary responsibility for ensuring that Angie's List's projections were reasonable and had a sound basis in fact, and for ensuring that Company insiders did not trade on the basis of material, non-public information.

104.    As a direct and proximate result of Defendants' gross mismanagement and breaches of duty alleged herein, Angie's List has sustained and will sustain significant damages.

105.    As a result of the misconduct alleged herein, these Defendants are liable to the Company.

106.    Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    For an order declaring that the Defendants breached their fiduciary duties to the Company;

B.    For an order awarding damages, together with pre- and post-judgment interest, to the Company;

C.    For an order requiring the immediate disgorgement of and/or imposition of a constructive trust on all profits, proceeds, and other benefits obtained by Defendants Oesterle, Hicks Bowman, Hundt, Thapar, Rutz, Krach and Maurer through their sales of Angie's List stock based on misappropriated confidential information of the Company;

D.    Directing Angie's List to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events

described herein, including, but not limited to, putting forward for shareholder vote resolutions amendments to the By-Laws and Articles of Incorporation and taking such other action as may be necessary to place before shareholder for a vote the following Corporate Governance Policies, including measures to:

  i. Strengthen the Board's supervision of disclosures, regulatory compliance, and related-party matters by the Company, including the development of procedures for greater shareholder input into the policies and guidelines of the Board and Audit Committee;

  ii. Terminate defendants Oesterle and Hicks Bowman from their positions as CEO and Chief Marketing Officer, respectively;

  iii. Require Angie's List to immediately configure its Board to have a majority of independent directors;

  iv. Terminate defendants Biddinger, Maurer, and Thronson as members of Angie's List's Audit Committee;

  v. Mandate that the Audit Committee meet to review the Company's compliance with legal, regulatory, and ethical norms, including "best practices" in connection with public disclosures;

  vi. Permit Angie's List's non-corporate shareholders to nominate at least four new candidates to the Board of Directors; and

  vii. Appropriately test and audit Angie's List's regulatory compliance with SEC and other governmental regulations.

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Such other relief as this Court deems just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated:  January 3, 2014

SCHUCKIT & ASSOCIATES, P.C.

*s/ Robert J. Schuckit*
Robert J. Schuckit, Esq. (#15342-49)
Sandra L. Davis, Esq. (#27803-53)
4545 Northwestern Drive
Zionsville, Indiana 46077
Telephone: (317) 363-2400
Facsimile: (317) 363-2257
*rschuckit@schuckitlaw.com*
*sdavis@schuckitlaw.com*

*Local Counsel for Plaintiff*

Albert M. Myers (*pro hac vice application to be filed*)
Melinda A. Nicholson (*pro hac vice application to be filed*)
KAHN SWICK & FOTI, LLC
206 Covington Street
Madisonville, LA  70447
Telephone:  (504) 455-1400
Facsimile:  (504) 455-1498
*al.myers@ksfcounsel.com*
*melinda.nicholson@ksfcounsel.com*

*Attorneys for Plaintiff*